(33 Misc. Rep. 520.)

### In re McKAY'S ESTATE.

(Surrogate's Court, Cattaraugus County. December, 1900.)

1. WILLS—CONSTRUCTION.

A will recited that "I give, devise, and bequeath my property as follows," and, after specifying certain general legacies, stated in the residuary clause that "I give * * * all the rest, residue, and remainder of my real and personal property as follows," stating the disposition. The personal estate, having been greatly reduced after the making of the will and the testator's death, was insufficient to pay all the general legacies in full. The will did not authorize the executors to sell the realty, which consisted of testator's homestead and an interest in certain stock yards, the operation of the latter affording employment to testator's son; and, if the realty was sold to satisfy the general legacies, it would deprive testator's widow, son, and grandchildren of property in favor of distant relatives and legatees in no way related. *Held*, that the phraseology of the will, in connection with the circumstances, precluded the intent on the part of the testator to blend his entire estate, making a common fund for the payment of all legacies.

2. LEASEHOLD—REALTY—STATUTES—REPEAL.

A testator owned a leasehold interest in certain stock yards, which were situated on an Indian reservation, and leased from the Seneca Indians. Laws 1881, c. 188, § 3, provided that lands situated in Indian villages and leased from the Seneca Indians are and shall be for all purposes considered a freehold estate, and on the death of any person owning the same shall, for the purposes of descent, be treated as real estate. *Held*, that such law was not repealed by Code Civ. Proc. § 2712, as amended by Laws 1893, c. 186, declaring that leases for years shall be deemed assets and go to the executors to be applied and distributed as personal property, since a special statute applicable to a particular locality is not repealed by a subsequent general statute unless the intention of the legislature to repeal the special statute is manifest, and hence testator's leasehold interest in the stock yards should be treated as realty.

3. EXECUTORS AND ADMINISTRATORS—COLLECTING RENT FROM REALTY—MISTAKEN IDEA—CREDIT DISALLOWED.

Where executors in their representative capacity assumed control of certain leasehold interests of the testator under the mistaken idea that the interests were personalty, the rents collected by the executors, and charged in their accounts, are not assets which general legatees are entitled to have distributed in payment of their legacies, but the same must be stricken from the executors' accounts, and the title adjusted between the legatees, the tenants who have paid these rents, and the executors in their individual capacity.

**4.** SAME—INCUMBERED REALTY—STATUTES—WRONGFUL DISBURSEMENT BY EX-
ECUTORS.

Testator joined with others in the purchase of land, the title being taken
in the name of F., one of the grantees, who gave a written statement to
each purchaser of his share and interest in the property. On the purchase.
F. assumed the payment of an existing mortgage to secure a portion of
the purchase price. 1 Rev. St. p. 749, § 4, provides that whenever any real
estate subject to a mortgage executed by a testator shall descend to an
heir, such heir shall satisfy the mortgage out of his own personal prop-
erty without resorting to the executor or administrator of the estate.
*Held* that, as this interest was realty, and as such passed to the residuary
legatees, the residuary legatees were charged with the payment of the
incumbrance on testator's share of such property, and hence the money
credited as paid by the executors in satisfying such mortgage should be
disallowed as against the general legatees.

**5.** SAME—WRONGFUL PAYMENT—BENEFIT OF RESIDUARY LEGATEES—REIM-
BURSEMENT.

Where executors in good faith paid money out of the funds of the estate
on realty for the benefit of the residuary legatees to carry out an enter-
prise which the testator had inaugurated, they were entitled to be reim-
bursed out of any funds held by them, or by the testamentary trustees for
the benefit of the residuary legatees, or of any funds due or to become due
to such residuary legatees.

Proceedings by the executors of the estate of Richard J. McKay,
deceased, for a final settlement. Settlement decreed.

James G. Johnson, for executors.

Ansley & Spencer, for widow and others.

W. G. Laidlaw, for certain legatees and special guardian, in per-
son.

DAVIE, S. There being insufficient personal estate to pay the
general legacies in full, it is claimed on part of certain legatees
that such deficiency should be made up from the real estate before
the same passes to the residuary legatees. The first clause of the
will is as follows: "After the payment of my funeral charges, the
expenses of administering my estate, and my lawful debts, I give,
devise, and bequeath my property as follows." Then follows a be-
quest to the widow of specific personal property and the sum of
$5,000 absolutely; also the use of $15,000 during life or until her
remarriage; also a life estate in the house and lot where testator re-
sided at the time of his death. The will distinctly provides that these
various bequests are in lieu of dower. The testator then gives to
his only son, John J. McKay, the house and lot above mentioned
absolutely after the termination of the life estate therein; also the
sum of $15,000 absolutely, to be paid in 15 equal annual payments,
with annual interest; also the use of $10,000, to be paid semian-
nually during life. Upon the death or remarriage of the widow, one-
third of the $15,000, the use of which is given to her, is bequeathed
to Roscoe J. McKay, a minor son of John J. McKay, and the remain-
ing two-thirds to the children of John J. McKay, including Roscoe,
in equal shares. Then follows a bequest of $2,000 to Mary Ann
McKay, mother of the testator, one of $1,000 to each of two sis-
ters, one of $2,000 to a sister-in-law, various smaller bequests to
nephews and nieces and other distant relatives, two small bequests

to Masonic societies, and a bequest of $2,000 to the Universalist
General Convention of the State of New York. A trustee was then
designated to control the funds the use of which was bequeathed
as above stated. Then comes the residuary clause, in the following
form: "Nineteenth. I give, bequeath, and devise all the rest, resi-
due, and remainder of my real and personal property as follows:
To my said wife, one-third part thereof; to my said son, one-third
part thereof; to my grandchildren, one-third part thereof." An in-
termediate accounting was had herein, and a decree entered thereon,
whereby it was determined that the bequests to the widow, being
in lieu of dower, were not subject to abatement, and that she was
entitled to interest on the same from the death of the testator, but
that no reasons existed for exempting any of the other bequests from
abatement. See In re McKay, 5 Misc. Rep. 123, 25 N. Y. Supp. 725.
But the precise question now under consideration—as to whether
the general bequests are entitled to be paid from the real estate—
was not determined. It is now claimed that the peculiar phrase-
ology of the first clause of the will, "I give, devise, and bequeath my
property as follows," and that of the residuary clause, "I give, devise,
and bequeath all the rest, residue, and remainder of my real and
personal property as follows," shows an intent on the part of the
testator to blend his entire estate into one common fund for the
payment of the various bequests, and that nothing should pass to
the residuary legatees until full payment of all other bequests had
been made. It seems to be the well-established rule in England
that, where legacies are given generally, and the residue of the real
and personal estate is afterwards given in one mass, as in this case,
the legacies are a charge upon the real as well as the personal es-
tate. Wheeler v. Howell, 3 Kay & J. 198; Gyett v. Williams, 2
Johns. & H. 429; Bray v. Stevens, 12 Ch. Div. 162. This rule has
been adopted in some of our states. Hays v. Jackson, 6 Mass. 149;
Wilcox v. Wilcox, 13 Allen, 252; Gallagher's Appeal, 48 Pa. St.
122; Robinson v. McIver, 63 N. C. 649; Moore v. Beckwith, 14 Ohio
St. 135. This rule was invoked in Bevan v. Cooper, 72 N. Y. 317,
but the court there says:

"It is urged to us that the rule in England is that, where the real estate and
the personal estate are by the residuary clause blended in one fund in terms
importing that the testator looked upon it as one mass for the purpose of dis-
position, the legacies are thereby charged upon the realty, and that sister
states and the supreme court of the United States have established or ap-
proved of that rule. We do not here undertake to question the soundness of
the reasoning of the decisions cited in support of this contention. We do
not think they furnish the rule for us in this case."

The same question was presented in Scott v. Stebbins, 91 N. Y.
605, but that case was decided upon other considerations, the court
neither adopting nor disapproving of the English rule. In Brill v.
Wright, 112 N. Y. 129, 19 N. E. 628, however, the court distinctly
disapproves of this rule, saying that "the rule in England and in
some of the states in this country and in the United States supreme
court is different from the rule in this state." See opinion, page
134, 112 N. Y., page 629, 19 N. E. That case distinctly enunciates
two propositions: First, that general language in a will giving

legacies, followed by the usual residuary clause, is alone insufficient to charge the legacies on the land; and, second, that such language will justify such charge if it is made to appear by extrinsic circumstances that it was the testator's intention that the legacies should be charged on the land. In Morris v. Sickly, 133 N. Y. 456, 31 N. E. 332, the testator, after several general legacies, provided as follows: "All the rest and remainder of my estate, both real and personal, of which I may die seised, I give, devise, and bequeath," etc.; and the court says: "It is now the settled law in this state that by the language contained in this will alone the legacy was not charged upon the real estate." See opinion, page 458, 133 N. Y., page 333, 31 N. E. See, also, Cunningham v. Parker, 146 N. Y. 29–33, 40 N. E. 635. But in this case now under consideration the claim that the real estate should be resorted to for payment of the bequests is not predicated so much upon the phraseology of the residuary clause as upon that of the introductory clause above cited, which, it is asserted, blends the entire estate into one homogeneous mass, without regard to its character, for payment of the bequests; and to sustain such intention the following authorities are relied upon: Forster v. Civill, 20 Hun, 282; Taylor v. Dodd, 58 N. Y. 335; Hall v. Thompson, 23 Hun, 334; Tracy v. Tracy, 15 Barb. 503. If these cases were to be regarded as correctly declarative of existing law, they are plainly distinguishable from the case at bar. In Forster v. Civill, the bequests were held to be a charge on the realty because of the fact that certain legacies must totally fail unless regarded as a charge, and, as the court in the opinion says, there is nothing in the will by which the words "the rest, residue, and remainder" can be taken distributively reddendo singula singulis, under the rule laid down by Chancellor Kent in Lupton v. Lupton, 2 Johns. Ch. 614, because "there is an entire absence of language indicating an intent on the part of the testator that the bequests shall be paid solely out of personal property, and also an absence of any devise of any portion of the real estate from which, under that rule, the words 'rest, residue, and remainder,' in respect of real estate, can be held to mean such as is not otherwise devised by the will." In the case at bar there was a specific devise of real estate prior to the residuary clause, and in view of which the residuary clause was framed. In Hall v. Thompson the will provided that: "As to my worldly estate and all the property, real, personal, and mixed, of which I shall die seised and possessed, and to which I shall and may be entitled at the time of my decease, I devise, bequeath, and dispose of it in the following manner, viz." Then follows a direction for the payment of debts and funeral expenses. Then the executors were empowered, as soon as possible after his death, to sell sufficient real estate to pay off a certain mortgage. Then the will provides as follows: "At the death of my said beloved wife my executor shall dispose of all my estate, and the accumulations and profits thereof, either by public or private sale, and divide the avails thereof, share and share alike, to and among my children," etc. From the terms of this will the court found that the intention of the testator was to blend all his estate, real, personal, and mixed,

for the general purposes of the will. All that Taylor v. Dodd assumes to hold is that, while the general rule is that the personal estate of the testator is to furnish the fund for the payment of legacies, it may be entirely exonerated, or the real estate may be made to aid, if there be express directions to that effect in the will, or if that be the clear intent to be gathered from its provisions. The conclusion reached from a careful review of all these cases is that there is nothing in this will leading to the arbitrary construction that its form and phraseology evidence an intent on part of the testator to blend his entire estate, making a common fund in which all bequests are equally entitled to participate. The most that can be said is that the question of testator's intent in this particular is one of fact, to be determined from the phraseology of the will and the contemporaneous circumstances disclosed by the evidence. It is entirely apparent that extraneous circumstances are to be considered in ascertaining such intent. In Kalbfleisch v. Kalbfleisch, 67 N. Y. 354, the court says, "Our conclusion is put upon the intention of the testator as manifested in the will, considered in view of the circumstances in which it was made." In Hoyt v. Hoyt, 85 N. Y. 142, it was held that "legacies may be charged upon real estate without express direction, if the intention of the testator so to do can be fairly gathered from all the provisions of the will; and extraneous circumstances may be considered in aid of the terms of the will." To same effect, see Scott v. Stebbins, 91 N. Y. 606. In that case, the bequests were held to be a charge on the residuary realty, and the controlling circumstance was that about one month before his death testator inventoried his personal estate at $22,500. After making the will, he purchased real estate, and built a house thereon, thereby diminishing his personalty, after payment of debts, to $2,000. In McCorn v. McCorn, 100 N. Y. 511, 3 N. E. 480, the court, after fully considering all the surrounding circumstances and the phraseology of the will, says, "Each of these circumstances, in our consideration of other cases, has had a place in the reasons given for inferring an intention to charge legacies upon the land." In Brill v. Wright, supra, extraneous circumstances were relied upon to aid in the interpretation of the will. See page 134, 112 N. Y., page 629, 19 N. E.

I now desire to refer to some of the circumstances repelling the inference of an intent on part of the testator to blend this estate into one general fund. It will, in the first place, be seen that such a construction would operate in favor of distant relatives and legatees in no way related as against testator's wife, son, and grandchildren. The importance of such a circumstance is recognized in Scott v. Stebbins, above cited, where the court says:

"The presumption is that the testator did not intend to give a preference to an object of charity or benevolence over the claims of his own children. The contest here is between a complete stranger and his own son. No inference is to be drawn in favor of the former, except what necessarily and naturally arises. Every intendment is in favor of the son of the testator. His own blood and kin were the first objects of his bounty, and it is to be presumed that the legacies to them were to be first paid. Any other conclusion must lead to the inevitable inference that the testator intended to give

a ·preference to a stranger that had no special claim upon him over his own kindred and lawful heirs. It is but fair to assume that such was not his intention."

In Hoyt v. Hoyt, above cited, the court says:

"The distinction is between a legacy to a stranger, which is a mere bounty, and a legacy that is the only provision for one of the blood of the testator who has a claim to recognition and provision. In such case courts go a great way in order to carry out the provisions ·of a will, founding the intention to ·make all parts of the estate liable upon the presumption of the strong desire and purpose that must have existed that one natural object of testamentary bounty should not receive and another go away empty. In one case it is said that this fact alone is enough to turn the scale, where the provisions of the will are otherwise dubious."

Again, the character and extent of testator's real estate repel the theory of an intention to blend. By far the greater portion of his estate was personal. The real estate consisted principally of the testator's homestead and an interest in the stock yards hereinafter referred to. The former was occupied by testator and family as a home. The operation of the latter afforded employment to the testator's son. It hardly seems probable that testator designed to create a condition by the terms of this will whereby mere gratuitous beneficiaries, like the Masonic orders and the Universalist General Convention, or even nephews and nieces, might deprive the son of his interest in the homestead, or his interest in the particular portion. of the estate which was affording him a livelihood. Again, it is entirely apparent that the testator, at the time of making his will, believed his personal estate sufficient to substantially satisfy his various bequests. The amount of personalty left for distribution has been greatly diminished. by circumstances arising after the making of the will and the death of the testator. The estate became chargeable to the extent of over $16,000 in consequence of testator's indorsement of certain Hevenor notes, the testator undoubtedly believing that he held ample security against loss on account of these indorsements; such security, however, proving to be entirely inadequate. Large expense. was also incurred in consequence of litigation in the administration of his estate, which testator evidently did not contemplate when he made his will. Again, if testator had designed a blending of his estate, he would undoubtedly have provided, by the terms of his will, a ready means of effectuating such intention by authorizing and empowering his executors to sell his real estate for that purpose. The power of sale contained in the various wills there considered seems to have been an important factor in the construction of such wills in the following cases: Taylor v. Dodd, 58 N. Y. 335–348; Hoyt v. ·Hoyt, 85 N. Y. 151, 152; Scott v. Stebbins, supra. There are various other circumstances, to which it is not necessary to specifically refer, in addition to those above mentioned, all leading to the conclusion that it was not the intention of the testator that the general bequests provided for in ·his will should be paid out of the real estate before the · residuary clause became operative.

The next question which arises relates to the character of the stockyard property,—as to whether the same is real or personal estate.

The evidence shows that on the 20th day of February, 1889, William T. Coleman and another, by a deed bearing date on that day, conveyed to the testator an undivided one-sixth part of the grantors' interest in 33 acres of land in the village of West Salamanca, known as the "Stock-Yard Property." The interest of the grantors in said land at the time of such conveyance was a leasehold thereof under a lease made by the Seneca Nation of Indians, pursuant to the provisions of the act of congress approved February 19, 1875, and entitled "An act to authorize the Seneca Nation of New York Indians to lease lands within the Cattaraugus and Allegany reservations, and to confirm existing leases" (18 Stat. c. 90, p. 330), such lands being upon the Allegany reservation, and within the limits of the village of West Salamanca, as surveyed and located under said act. The courts have declared that the passage of this act was a constitutional exercise of legislative authority on part of congress creating a valid interest in land. Ryan v. Knorr, 19 Hun, 540; Wait v. Jameson, 15 Abb. N. C. 382. A recent amendment to such act authorized the renewal of these leases for the period of 99 years. Laws U. S. 1890, c. 1132. Congress, recognizing the peculiar conditions existing upon these Indian reservations, the extensive interests of the white occupants within the villages specified in the act cited, saw fit to provide for a permanent tenure on part of the lessees. This purpose was effectuated by the act of 1875, as amended in 1890. It was undoubtedly within the province of our state legislature to define and determine the nature of this title for the purposes of transfer, descent, and distribution. An act was accordingly passed by the state legislature providing as follows:

"Land situate in said villages, held by or under lease from the Seneca Nation of Indians, and which the holders are entitled to have renewed at the expiration thereof by virtue of said act of congress, are and shall be for all purposes considered a freehold estate and the owners of such leases freeholders, and the right of dower and tenant by curtesy shall attach thereto, and shall upon the death of any person owning the same without having devised it, descend in the same manner as a freehold of inheritance and shall for that purpose be treated as real estate." Laws 1881, c. 188, § 3.

The provisions of this statute were substantially re-enacted and incorporated in the general Indian law (Laws 1892, c. 679, art. 4, § 71), and were in full force at time of the death of the testator. Section 2712 of the Code, as amended by chapter 186 of the Laws of 1893, provides:

"The following shall be deemed assets and go to the executors or administrators, to be applied and distributed as part of the personal property of the testator or intestate, and be included in the inventory: (1) Leases for years; lands held by the deceased from year to year."

If it is claimed that the distribution of this estate should be in accordance with the statute as now existing, instead of the law in force at date of death of the testator, still the general law defining "assets" does not repeal the provisions of chapter 188 of the Laws of 1881, re-enacted by the general Indian law above referred to. There is no express repeal of these earlier acts by the provisions of the general statute of 1893 (Code, § 2712), nor are they included in

the schedules of laws repealed at the end of the latter statute. The principle seems well settled, and it is a rule of statutory construction, that a special statute providing for a particular case, or applicable to a particular locality, is not repealed by a subsequent general statute in its terms and application, unless the intention of the legislature to repeal or alter the special law is manifest, although the terms of the general act would, taken strictly, and but for the special law, include the case or cases provided for by it. Buffalo Cemetery Ass'n v. City of Buffalo, 118 N. Y. 61, 22 N. E. 962; Van Denburgh v. Village of Greenbush, 66 N. Y. 1; Whipple v. Christian, 80 N. Y. 525. In view of these various considerations, it must be held that the interest of the testator in the stock-yard premises is real estate, and as such passes under the residuary clause of the will.

It appears from the evidence that, directly after the probate of the will, the executors, assuming the interest of the testator in the stock-yard premises to be an asset, took control thereof, and rented the same continuously to the time of filing their account, receiving rents therefor aggregating $1,268, with which they charge themselves in the account filed. The general legatees claim that this fund should be distributed, and applied upon their legacies. In view of the conclusions already reached regarding the character of the stock-yard premises, this claim is untenable. Testator's interest in these yards passed directly and absolutely to the residuary legatees under the terms of his will. The executors, as such, derived no interest in or authority over the same. The fact that they assumed to receive these rents in their special capacity, through a mistake as to the character of this property, affords no reason in law or equity for holding this fund to be assets, nor has this court any jurisdiction upon this accounting to direct the executors to pay these rents over to the residuary legatees. The title to this fund must be adjusted between the legatees, the tenants who have paid these rents, and the executors in their individual, and not their representative, capacities. This item was improperly included in the executors' account, and should be stricken therefrom. One other item of the account requires special mention. Some time prior to his death, the testator, in company with others, purchased a tract of land then supposed to be valuable, near the city of Buffalo, for speculative purposes, and, for convenience in making transfers, the title thereto was taken in the name of Mr. Fancher, one of their number. The deed was absolute in form to Fancher, but upon its delivery he executed and delivered to each of the interested parties a statement in writing, defining the extent of each one's share of such land as follows: "That said property is held in trust for the following named parties, and that the share of each is set opposite his name; the whole number of shares being thirty: * * * R. J. McKay, 1½ shares." At the time of the purchase, Fancher executed a mortgage on such lands, or assumed the payment of an existing mortgage, to secure a portion of the purchase price, each of the shareholders agreeing to pay his respective proportion thereof. This interest, on part of testator, was real estate. The situation was practically the same as if testator had procured a deed of his undivided

interest, and given back a mortgage thereon, to secure the payment of his proportionate share of the unpaid purchase price. This real-estate interest passed to the residuary legatees under the will, but they simply took, as such devisees, the equity of redemption, and were required to pay and satisfy the incumbrance existing thereon. 1 Rev. St. p. 749, § 4; Meyer v. Cahen, 111 N. Y. 270, 18 N. E. 852. This statute provides that:

"Whenever any real estate, subject to a mortgage executed by an ancestor or testator, shall descend to an heir, or pass to a devisee, such heir or devisee shall satisfy and discharge such mortgage out of his own personal property, without resorting to the executor or administrator of his ancestor, unless there be an express direction in the will of such testator that such mortgage be otherwise paid."

Under this statute the payment of this incumbrance became charged upon the residuary legatees, and the executors were not authorized to make the payments thereon out of the personal estate. Accordingly, the item of $1,024, with which they have credited themselves in the account filed as having been paid on the Buffalo lands, must be disallowed as against the general legatees. This payment, however, having been made by the executors, concededly in good faith, carrying out an enterprise which the testator had himself inaugurated, and having been so paid for the benefit of the residuary legatees, they should be reimbursed out of any funds now held by them for the benefit of said residuary legatees, or by the trustees appointed under the will of deceased of any funds now due or to become due to said residuary legatees. The other controverted items of the account filed are disposed of with sufficient certainty by the specific findings filed herewith.

Decreed accordingly.